UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NOAH SCHRODER,<br><br>               Plaintiff,<br><br>   v.<br><br>CORIZON MEDICAL, ZAKROFF,<br>PHYSICIAN'S ASSISTANT REESE,<br>JAY CHRISTENSEN,  SERGEANT<br>BONJOVI, CORPORAL FRAHS, and<br>RONA SIEGERT,<br><br>           Defendants. | Case No. 1:21-cv-00052-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

      Plaintiff Noah Schroder's allegations arise from his incarceration at the Idaho Maximum Security Institution (IMSI). Plaintiff alleges that he has Celiac disease but Defendants in this action ignored his serious health issues, allowed him to be given an inappropriate diet, and denied him medication. He brings Eighth Amendment deliberate indifference claims and state law medical malpractice claims. Pending before the Court is the Motion for Summary Judgment filed by the remaining Defendants in this action—Dr. Sandra Zakroff, nurse practitioner Anthony Reece, and prison medical administrator Rona Siegert. Dkt. 32.

**MEMORANDUM DECISION AND ORDER - 1**

Plaintiff has filed his Response, and Defendants have filed their Reply and a Supplement. Dkts. 34, 35, 37. Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record and that oral argument is unnecessary. *See* D. Idaho Loc. Civ. R. 7.1. Accordingly, the Court enters the following Order.

## REVIEW OF CLAIMS AND DEFENSES

### 1. Standard of Law

Summary judgment is appropriate when a party can show that, as to a claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit." *Id*. at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

**MEMORANDUM DECISION AND ORDER - 2**

The Court does not determine the credibility of affiants or weigh the evidence. Although all reasonable inferences that can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

Pro se inmates are exempted "from strict compliance with the summary judgment rules," but not "from all compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018). At summary judgment, courts "do not focus on the admissibility of the evidence's form," but "on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

The Eighth Amendment to the United States Constitution protects prisoners against cruel and unusual punishment. To state a claim under the Eighth Amendment, Plaintiff must state facts showing that he is "incarcerated under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities" as a result of Defendants' actions—which is analyzed under an objective standard. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). Plaintiff must also bring forward facts showing that Defendants were deliberately indifferent to his needs—analyzed under a subjective standard.

As to the objective standard, the Supreme Court has explained that, "[b]ecause society does not expect that prisoners will have unqualified access to health care,

**MEMORANDUM DECISION AND ORDER - 3**

deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

As to the subjective factor, to violate the Eighth Amendment, a prison official must act in a manner that amounts to deliberate indifference, which is "more than ordinary lack of due care for the prisoner's interests or safety," but "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. Stated another way, deliberate indifference exists when an "official knows of and [recklessly] disregards an excessive risk to inmate health or safety," which means that an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 838.

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Medical negligence or malpractice alone will not support a claim for relief under the Eighth Amendment. *Broughton v. Cutter Lab*, 622 F.2d 458, 460 (9th Cir. 1980). Rather, a constitutional tort requires the plaintiff show subjective deliberate indifference by bringing forward facts demonstrating that the defendant acted deliberately, intentionally, or so recklessly that the conduct can be equated with a desire to inflict harm. *See Farmer*, 511 U.S. 835-38. Likewise, gross negligence and ordinary negligence are not actionable

under § 1983, because such actions are not an abuse of governmental power, but rather a "failure to measure up to the conduct of a reasonable person." *Daniels v. Williams*, 474 U.S. 327, 332 (1986).

Title 28 U.S.C. § 1367 provides that a district court may exercise supplemental jurisdiction over state claims when they are "so related" to the federal claims "that they form part of the same case or controversy under Article III of the United States Constitution." In other words, the supplemental jurisdiction power extends to all state and federal claims that a litigant ordinarily would expect to be tried in one judicial proceeding. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

To state a claim for negligence, a plaintiff must provide adequate factual allegations showing the following: (1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of the defendant's duty; (3) a causal connection between the defendant's conduct and the plaintiff's injury; and (4) actual loss or damage. *Nelson v. Anderson Lumber Co.*, 99 P.3d 1092, 1100 (Idaho Ct. App. 2004). To show breach, a patient must provide expert testimony supporting his position. For a patient to prevail on a medical malpractice claim,  Idaho Code §§ 6-1012 and 6-1013 requires that a plaintiff prove through "direct expert testimony" that the medical defendants failed to meet the applicable standard of health care practice in the community. "If a plaintiff in a medical malpractice action fails to provide expert testimony evidence that the defendant negligently failed to meet the applicable standard

**MEMORANDUM DECISION AND ORDER - 5**

of health care, the medical defendant is entitled to summary judgment." *Eldridge v. West*,

166 Idaho 303, 312-13, 458 P.3d 172, 181-82 (2020) (*citing Mattox v. Life Care Centers*

*of America, Inc*., 157 Idaho 468, 473 (2014)).

In addition, Idaho Code § 6-1001 provides for mandatory prelitigation screening

by the Idaho Board of Medicine before a patient can bring a malpractice case involving

claims for damages against physicians and surgeons practicing in the state of Idaho.

### 2.  Facts re: Nature of Illness and Prior Treatment

Celiac disease causes a person to have an immune reaction to eating gluten, which

is a substance found in wheat and barley. Dkt. 32-4, Declaration of Dr. Sandra Zakroff ,

p. 4. It causes inflammation that leads to malabsorption and can cause gastrointestinal

symptoms and rashes. *Id*. A person can have gluten sensitivity but not have Celiac

disease. *Id*. There is no cure for Celiac disease; treatment for Celiac disease is a gluten-

free diet. *Id*.

Celiac disease can cause dermatitis herpetiformis (DH), which is "an

inflammatory cutaneous disease with a chronic relapsing course, pruritic polymorphic

lesions, and typical histopathological and immunopathological findings." [1] "According to

several evidences, DH is considered the specific cutaneous manifestation of celiac

---

[1] *See* Emiliano Antiga and Marzia Caproni, "The diagnosis and treatment of dermatitis
herpetiformis," published online 2015 May 13. doi: 10.2147/CCID.S69127/.

**MEMORANDUM DECISION AND ORDER - 6**

disease." *See* Footnote 1. DH can be treated with dapsone, sulfones or steroids. *See id.* Dapsone can treat skin rashes but does not cure celiac disease. Dkt. 32-4, p. 4. Dapsone can have detrimental side effects, including methemoglobinemia, which "is a condition where too little oxygen is delivered to the body's cells." *Id.*

Plaintiff told prison medical doctors and specialists that Dr. Bender of Primary Health Care in Boise diagnosed Plaintiff with Celiac disease in 2015 and prescribed dapsone for him before his incarceration. Dkt. 32-5, p. 55. Prior to the time period at issue, from 2018 through May 2020, Plaintiff saw various medical providers and staff at IDOC and reported to them that he had been diagnosed with celiac disease in 2015, requiring a gluten-free diet and a prescription of dapsone, which he was provided.

A medical provider who is not a named defendant ordered lab testing for gluten intolerance on February 21, 2020. The results indicated Plaintiff had a positive reaction to the gluten intolerance test and required a gluten-free diet. Dkt. 34-1, p. 3; Dkt. 32-4, p. 4. The testing scale ranged from .10 (absent), .10-.34 (very low), to 17.5+ (very high). Plaintiff's score was .16, very low. Dkt. 32-5, p. 37.

### 3.  NP Anthony Reece: Eighth Amendment Claims

Nurse practitioner (NP) Anthony Reece first treated Plaintiff at a medical appointment on June 17, 2020. Declaration of Anthony Reece, Dkt. 32-6, p. 3. Reece refilled Plaintiff's Dapsone prescription, which he had been taking to help manage his gluten intolerance. *Id.*

**MEMORANDUM DECISION AND ORDER - 7**

On September 16, 2020, Plaintiff again saw NP Reece where Plaintiff reported that his dosage of 100 mg of  Dapsone was not working for the rash anymore, and so Plaintiff had been doubling his prescribed dosage to 200 mg to treat intense itching. Dkt. 32-6, p. 3. At that appointment, NP Reece renewed the Dapsone, increasing it to 200 mg per dosage as requested, and ordered additional laboratory testing for Plaintiff to check for liver function and anemia issues that may result from the Dapsone use. Dkt. 32-5, pp. 30-31.

On September 30, 2020, the lab results showed that Plaintiff had hypoxemia (a low level of oxygen in the blood and arteries), but not the other deficiencies Reece had ordered to be tested. *Id*. Nothing in the record shows that NP Reece suspected or knew that the hypoxemia could have been caused by the Dapsone at that time.

On October 1, 2020, Plaintiff had two chest x-rays for the hypoxemia. The impression was "negative chest," with "clear and expanded" lungs. However, based on the abnormal oxygen lab results, NP Reece continued to look for answers, and on October 29, 2020, he ordered testing to assess Plaintiff's lung function. *Id*., p. 26.

On November 11, 2020, Plaintiff reported to an unknown sick call medical provider (possibly Roger Brewer, who entered the chart note) that he still had not been scheduled for his blood work. *Id*., p. 24.

On November 21, 2020, Plaintiff reported to an unknown sick call nurse that he had been having trouble breathing and catching his breath for over a month. He was very

upset that he was supposed to have a respiratory test and blood work, and that hadn't been done. Dkt. 32-5, p. 22. The sick call nurse scheduled Plaintiff to see Reece on November 25.

On November 25, 2020, Plaintiff was again seen by NP Reece for a scheduled follow-up appointment. Plaintiff reported experiencing shortness of breath for a month. Examination of the lungs on that date showed no wheezes, crackles, or rhonchi. Dkt. 32-5, p. 21. Further testing on that date showed low oxygen. *Id.*, p. 22. Plaintiff was transported to the hospital emergency room for further evaluation. *Id.*

The ER doctor diagnosed Plaintiff with methemoglobinemia[2] due to his dapsone use. Dkts. 32-6, p. 5; 37-1, p. 2. The doctor's notes state: "Will treat with oxygen therapy at home. We will stop the dapsone. Will need repeat methemoglobin. Is given strict return precautions. Feels comfortable to plan of care." Dkt. 37-2, p. 6. The ER "Follow-Up Instructions" (discharge instructions) recommended: (1) stop the dapsone medication, (2) recheck blood & oxygen, and (3) a gluten free diet. Dkt. 37-1, p. 2.

However, the "Emergency Services Medication List" from the ER visit states: "THESE ARE THE MEDICATIONS YOU SHOULD BE TAKING: dapsone 100 Milligram By Mouth once a day."  And "STOP TAKING THESE MEDICATIONS: None." Dkt. 37-1, pp. 4-5.

---

[2] The hospital record contain a typo, "hethemoglobinemia," not methemoglobinemia.

**MEMORANDUM DECISION AND ORDER - 9**

Upon Plaintiff's return to the prison facility the same day, his dapsone prescription was discontinued. On November 30, 2020, NP Reece ordered additional labs to check Plaintiff's methemoglobin. *Id.* Reece recommended substituting sulfapyridine for dapsone. *Id.*

On December 9, 2020, Plaintiff again saw NP Reece, and at that appointment, Plaintiff's oxygen was registering as low. *Id.*, p. 5. When NP Reece asked Plaintiff if Plaintiff had resumed taking dapsone, despite being instructed against it, Plaintiff admitted to taking his leftover dapsone medication because his rash had gotten worse. *Id.* NP Reece informed Plaintiff of the risks of continuing to take the dapsone, and despite this, Plaintiff stated he would continue to take leftover dapsone in his possession despite the risks associated with doing so. *Id.* Reece prescribed sulfasalazine in 500 mg tablets to replace the dapsone.

On December 14, 2020, Reece renewed Plaintiff's prescriptions for sulfasalazine and prednisone (prescribed by Dr. Zakroff, as described below). Dkt. 32-5, p. 17. Reece provided no further care to Plaintiff after December 2020.

Upon these facts, Plaintiff's Eighth Amendment claim against Reece fails on the subjective prong. The Eighth Amendment standard is a more difficult standard to meet than negligence or medical malpractice. A prison medical provider acts with "deliberate indifference . . . only if the [medical provider] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th

Cir. 2002) (citation and internal quotation marks omitted). "Under this standard, the [defendant] must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting Farmer, 511 U.S. at 837).

What is missing here is any evidence that, before Plaintiff was taken to the ER, Reece drew the inference that the low oxygen level in Plaintiff's blood was a side effect of the dapsone medication. The applicable legal rule is that "[i]f a person should have been aware of the risk, but was not, then the person has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188 (citation omitted). Reece *did* know that liver function and anemia could be negative side effects of dapsone, and thus, according to his knowledge and training, he ordered testing to determine whether those side effects were occurring. After the test results showed only low oxygen, the fact that Reece ordered additional testing to determine the cause of the low oxygen showed that he recognized that the condition was serious enough to require a causal analysis and wanted to remedy the low oxygen issue. Had he suspected or known at that point that discontinuing dapsone would remedy the low oxygen condition, there would have been no need for him to order the additional testing. Nothing shows that Reece knew or suspected the true cause of the oxygen deficiency, and, nothing shows deliberate indifference, because Reece ordered additional testing according to what he *did* suspect

**MEMORANDUM DECISION AND ORDER - 11**

and know. Plaintiff also interfered with Reece's treatment by taking dapsone against prison medical providers' orders. That the hospital records contained a mistake does not factor in to the liability question for Reece, because prison medical providers did, in fact, recognize that the ER doctor recommended discontinuation. The hospital transcriptionist made an error, but no one followed it, recognizing it was error.

Nothing in the record showed that Reece knew or suspected that too much dapsone was causing Plaintiff's breathing issues. Reece ordered several tests to determine the cause. Nothing shows that Reece should have reinstated dapsone after Plaintiff returned from the hospital, due to causal connection between the dapsone and the dangerous levels of oxygen in Plaintiff's blood.

Reece ordered tests that were not performed in a timely manner. Nothing in the record shows that Reece was responsible for scheduling the tests; therefore, Plaintiff's allegations about delayed testing lacks a causal connection. Nor does the record show that, if Plaintiff would have received the tests earlier, prison medical personnel would have reinstated dapsone. To the contrary, the risk was high enough that prison officials acted within their medical expertise and judgment to decide against reinstating dapsone at any dosage.

Reece stopped treating Plaintiff before the specialist visits took place, but, even then, as explained in more detail below, their opinions do not show that Reece's

MEMORANDUM DECISION AND ORDER - 12

treatment of Plaintiff violated Plaintiff's Eighth Amendment rights. This claim will be dismissed with prejudice.

### 4.  NP Reece: Medical Negligence or Malpractice Claims

Plaintiff has failed to come forward with an expert opinion showing that NP Reece's care of Plaintiff amounted to negligence or medical malpractice. Particularly, a medical expert's opinion is necessary to show the proper standard of care, breach of that standard (duty), and causation. For these reasons, the state law claims will be dismissed with prejudice.

### 5.  Dr. Sandra Zakroff: Eighth Amendment Claims

Dr. Zakroff first saw Plaintiff at an appointment on December 24, 2020. He complained of a rash. He was taking Sulfasalazine for his rash, but reported it was not helping. Dr. Zakroff changed the treatment for Plaintiff's rash to oral prednisone. Dr. Zakroff recommended that Plaintiff not be re-prescribed dapsone, because it had caused methemoglobinemia, which had caused his emergency hospitalization in November.

Because Plaintiff self-reported celiac disease, Dr. Zakroff entered that into his medical chart on January 7, 2021. Also on that date, Plaintiff reported that his skin rash was improving on prednisone.

On January 23, 2021, Plaintiff pushed his emergency call button and reported that he had difficulty breathing, had all over body pain, had sores all over his body including on his anus, couldn't defecate, couldn't eat because of his gluten intolerance, and was

very upset with medical for not treating his condition and for losing his lab test orders. He asserted that he hadn't seen a medical provider in months for his conditions. Dkt. 32-5, p. 11.

On January 28, 2021, Plaintiff had lab samples drawn pursuant to Dr. Zakroff's order for a complete blood count, methemoglobin, prealbumin, and a complete metabolic panel On that same date, Dr. Zakroff also renewed Plaintiff's prednisone prescription.

On January 30 or 31, 2021, Plaintiff saw NP Jose Celadon and Dr. Zakroff during sick call. He complained of diarrhea, skin break-outs, and constant abdominal pain. He was worried about gluten cross-contamination in the kitchen. He asserted that the ER doctor told him that his November ER visit for low oxygen was a minor reaction and that he could restart the drug once his levels were back to normal.

Dr. Zakroff said that she has involved the warden and the dietician about a request to have Plaintiff's meal packaged to avoid cross-contamination, but the request was not approved. Dr. Zakroff said that the kitchen reported that staff understood the rules about not cross-contaminating food.[3] Plaintiff reported he had not been eating because of his

---

[3] Dr. Zakroff did all that was required within her area of responsibility. Plaintiff's argument that "it is in dispute as to whether the plaintiff ever received his prescribed medical diet" must be made against different defendants. Dkt. 34, p. 13. If Plaintiff was not receiving the gluten-free diet or believed that cross-contamination was still an issue, he should have grieved and sued the kitchen staff, which is a completely different issue from whether such a diet was medically prescribed. Despite Plaintiff's assertion that he is not receiving a gluten-free diet, he also asserts that his gluten-free diet is bland, and that he should also be given the same treats that are included in the mainline diet, such as juice, string

(Continued)

**MEMORANDUM DECISION AND ORDER - 14**

fear of cross-contamination and had been losing weight. Dr. Zakroff explained the need for a GI consult. Dkt. 32-5, pp. 8-9. Based on Dr. Zakroff's medical judgment, she determined that the gluten-free diet was the appropriate treatment for Plaintiff, whether he had a mild gluten intolerance or Celiac disease.

On February 1, 2021, Plaintiff saw Dr. Zakroff, who explained why she would not restart dapsone. She also noted that Plaintiff's methemoglobinemia has not been retested during his 5 to 7 recent blood tests. Plaintiff said, "I can't take it anymore." He reported ongoing constant itching resulting in rupture of blisters to the elbows and knees and a rash in his buttocks area. He requested something for pain. Dkt. 32-5, p. 8. The note reflects  that Plaintiff was made aware that urgent consults to GI and dermatology had been submitted, and were awaiting approvals. *Id*.

On February 5, 2021, Plaintiff had an appointment with Dr. Zakroff. She evaluated Plaintiff and determined that he had erythematous plaques and pustules. She prescribed cyanocobalamin (a synthetic version of vitamin B-12) and prednisone for his symptoms and scheduled a follow-up visit.

---

cheese, yogurt, and potato chips. That, again is not a medical issue. Plaintiff also asserts that his gluten-free diet does not include sufficient protein; however, the omissions in the diet are not protein-based foods but starchy foods such as wheat bread, that is not a substantial source of protein. This, again, is not an issue for a medical provider to address, but a kitchen dietician.

**MEMORANDUM DECISION AND ORDER - 15**

On February 18, 2021, Plaintiff had an appointment with Dr. Zakroff. Plaintiff reported that his skin condition was improving with the prescription medication. She showed him commissary records the dietician had obtained showing he had been ordering flour tortillas, Twix, Milky Ways, peanut butter crackers, and soy sauce—all of which contain gluten. Plaintiff stated that he got these items to pay debts to other inmates, and then later stated that he never received these items. Dkt. 32-5, p. 6. Because whether Plaintiff ordered and consumed food containing gluten from the commissary is disputed (including whether Dr. Zakroff saw him eating two doughnuts), the Court does not rely upon these allegations in its ruling on the Motion for Summary Judgment. However, it is undisputed that Dr. Zakroff counseled Plaintiff about how to read food labels to check for gluten to ensure that he adhered to a gluten-free diet. She also set a follow-up appointment.

On March 1, 2021, the blood test revealed a .5 methemoglobin test result, with a reference range of 0.0 to 1.5. Dkt. 32-5, p. 36. On March 2, 2021, On March 2, 2021, Dr. Zakroff authorized a gluten-free diet for Plaintiff due to a positive IgE lab result. Dkt. 32-5, p. 50.

On April 19, 2021, Plaintiff had another gluten intolerance test that showed all of his readings were below 7.0 (1.2, .4, .6, and .6), on a scale dictating that less than 7.0 was negative, 7.0 to 10.0 is equivocal, and over 10.0 is positive. Susan Sansom, the provider who read the test results, noted in the medical records: "Patient does not have celiac

disease or gluten allergy, notified HSA Nicodemus." Dkt. 34-1, p. 4. During a medical

appointment on May 10, 2021, Sansom determined that Plaintiff should see the

dermatologist to see what his recommendations were for treatment of his skin issues,

because the gluten test was negative and Plaintiff insisted that he was not consuming any

gluten, and yet still had the rash. Dkt. 32-5, p. 2.

On April 19, 2021, Plaintiff had another appointment with Dr. Zakroff. He

reported that he was no longer having diarrhea and his skin was better on prednisone. He

stated that he would sign a waiver if she would prescribe dapsone again. Dr. Zakroff said

she would review the specialists' opinions when they were received, but that, in her

medical opinion, the potential harm of taking dapsone significantly outweighed the

benefits. Dr. Zakroff did not treat Plaintiff after April 19, 2021.

Plaintiff has not shown that Dr. Zakroff was deliberately indifferent to his gluten

intolerance issue and his symptoms of abdominal upset and skin rashes. Dr. Zakroff was

not required to reinstate Plaintiff's dapsone prescription, given the serious side effects

and Plaintiff's history of taking more of this medication than was prescribed. Dr. Zakroff

was entitled to rely on her own training and experience, including her experience in

correctional medicine. Differences in medical opinions under these particular

circumstances does not equal deliberate indifferent. The record is replete with Dr.

Zakroff's constant and varied efforts to diagnose and treat Plaintiff's symptoms: two

different medications were prescribed; cross-contamination issues were researched with

the warden, prison dietician, and kitchen staff; counseling on how to avoid gluten in commissary items was given; lab testing was done, though somewhat slowly; outside specialist consultations were ordered and completed, again somewhat slowly; and many follow-up evaluations were performed. Nothing in the testing or expert evaluations shows that Dr. Zakroff should have done something other than she what she chose to do, based on her medical judgment. This claim will be dismissed with prejudice.

### 6.   Dr. Sandra Zakroff: Malpractice Claims

Dr. Zakroff has not received a prelitigation complaint from the Idaho State Board of Medicine, nor has she attended, or been required to attend, a prelitigation hearing prior to Plaintiff's lawsuit being filed or at any time to date. Dkt. 32-4, ¶ 7. Accordingly, Plaintiff's claims against Dr. Zakroff are barred by Idaho Code Section 6-1001.

### 7.   Treatment that Occurred After Defendants Ceased Treating Plaintiff

On April 28, 2021, after treatment by NP Reece and Dr. Zakroff ceased, Plaintiff had a virtual appointment with a doctor at the Idaho Gastroenterology Associates clinic in Nampa, Idaho. Plaintiff reported to the doctor that he was diagnosed with Celiac in 2013 or 2014 by a dermatologist. He reported to the doctor that "he was told that if he took dapsone he would not have to stay on a gluten-free diet." Dkt. 32-5, p. 67. Because Plaintiff reported that he was asymptomatic as far as gastrointestinal symptoms if he avoided gluten, the doctor opined that the gluten-free diet was the key to solving his

gastrointestinal problems. Dkt. 32-5, p. 68. The skin issue was referred to a dermatologist. *Id*.

When Plaintiff saw dermatologist Gregory Wells on May 25, 2021, Plaintiff reported to Dr. Wells that he had a difficult time avoiding gluten in prison. Dkt. 32-5, p. 55. Plaintiff told Dr. Wells that "a strict gluten-free diet is impossible in prison." *Id*. Dr. Wells recommended that Plaintiff's gluten-free diet be controlled to make sure there was no cross-contamination with foods containing gluten.

Dr. Wells reported that a gluten-free diet would be Plaintiff's best option. Other options included restarting dapsone or sulfasalazine. Plaintiff said he preferred dapsone "knowing the potential risk of methemoglobinemia." *Id*. Plaintiff told Dr. Wells that he believed the low oxygen was the result of B12, Folic acid, and iron deficiencies. Dr. Wells reported that, if Plaintiff was, in fact, diagnosed with methemoglobinemia, Plaintiff should avoid dapsone. Dr. Wells reported that some practitioners had used "vitamin C and cimetidine po tid [meaning by mouth three times a day] to alleviate the effects of dapsone induced methemoglobinemia and the effects are dose dependent." Dr. Wells said that prison medical providers "could consider using dapsone 25 mg po daily to up to 25 mg po bid to see how he does." "I am unsure what his previous dose was," Dr. Wells wrote. He also recommended considering sulfasalazine, 500 mg. *Id*. He further recommended obtaining the records of Dr. Bender if prison health care providers were unsure of Plaintiff's diagnosis. *Id*.

**MEMORANDUM DECISION AND ORDER - 19**

Both specialists recommended that Plaintiff remain on a gluten-free diet. Neither recommended dapsone as necessary or required. Dr. Wells said Plaintiff should avoid dapsone because of his methemoglobinemia, and said that providers "could" retry a small dosage, along with vitamin C and cimetidine, which can reduce the effects of dapsone on low oxygen levels, and but that is far from an opinion that dapsone was required. NP Reece and Dr. Zakroff, knowing Plaintiff and his history, and having experience working in the context of correctional medicine, were well within the bounds of their medical judgment to decline to provide a low level of dapsone along with potentially remediating substances, given his history that the drug had put his life at risk in the past.

The specialists' opinions also contravene Plaintiff's assertions that Defendants were merely treating symptoms and not the causes of his skin rash. Plaintiff, his tests, and his providers concluded that he has a gluten issue. Both specialists opined that the only treatment for gluten issues is a gluten-free diet. Medications, such as dapsone and prednisone can be used to treat rashes caused by Celiac disease or gluten intolerance, but because the rashes are caused by the gluten issue, and the gluten issue is incurable, it is clear that Defendants were taking actions to address causation in a manner that met Eighth Amendment standards.

### 8.  Rona Siegert: Eighth Amendment Claims

Rona Siegert, a registered nurse, was the IDOC medical director at the time of Plaintiff's complaints. Part of her job is reviewing inmate grievances and courses of

**MEMORANDUM DECISION AND ORDER - 20**

treatment to determine whether inmates are receiving timely and appropriate medical treatment. She summarizes her review of Plaintiff's grievance as follows:

> In February 2021, I conducted a third level appellate review of a medical grievance submitted by Mr. Schroder. A true and correct copy is attached hereto as Exhibit A, GR000062-63. Mr. Schroder contended that a treatment plan was developed after an emergency department visit and was not being followed. (Id.) Specifically, he contended he needed daily B12 injections, folic acid, and Dapsone replacement. (Id.) The first and second level responses showed that Mr. Schroder had been working with NP Reece and Dr. Zakroff to manage Mr. Schroder's concerns, and that labs had been ordered to assist in managing his care. (Id.) In the third level appeal, Mr. Schroder's comments were that he did not believe the treatment plan and medications were being followed. (Id.) In my response, I noted that the records showed Mr. Schroder was being seen by multiple providers in the clinic, that his medications were adjusted and re-ordered, that he had a gastroenterology consult scheduled, that his diet was discussed, and he reported to his providers he was improving on Prednisone. I also conveyed that I understood his frustration with his lab work. (Id.) I stated an employee at the prison had contacted the hospital lab for more information on why Mr. Schroder's lab work had not yet been successfully completed, and that the lab work had been re-ordered. (Id.) 9.

Dkt. 32-3, Declaration of Rona Siegert, p. 3.

In contrast to Plaintiff's assertions in the Grievance, the ER doctor's notes state: "Will treat with oxygen therapy at home. We will stop the dapsone. Will need repeat methemoglobin. Is given strict return precautions. Feels comfortable to plan of care." Dkt. 37-2, p. 6. The ER "Follow-Up Instructions" (discharge instructions) recommended: (1) stop the dapsone medication, (2) recheck blood & oxygen, and (3) a gluten free diet.

Dkt. 37-1, p. 2. These instructions do not support Plaintiff's contentions that prison medical staff were not following the ER doctor's orders, other than the bloodwork was not performed until four months after the ER visit. Plaintiff has not identified and sued specific defendants for failing to schedule the blood testing. Plaintiff has not shown a causal connection to any of the named defendants—that any particular defendant was responsible for scheduling the testing, as opposed to a non-defendant medical administrative staff person.

As noted above, when the lab work was finally performed, it did not require changes to Plaintiff's course of treatment. Plaintiff has not shown that, had he been given the testing earlier, he would have been placed back on dapsone, which is the object of his lawsuit. In fact, the entire record supports Defendants' decisionmaking that placing Plaintiff back on even a low dosage of dapsone was too great a risk to his life.

Here, Plaintiff has not shown that Siegert was deliberately indifferent to Plaintiff's treatment issues when she reviewed his medical records and treatment. She  determined that his treatment had been appropriate, except for lab work that had been ordered and not completed. Siegert contacted a medical staff person, who reordered the lab work. Therefore, Siegert performed her job by finding a deficiency in the treatment and remedying it when the problem was brought to her attention.

Plaintiff also complains that Rona Siegert was deliberately indifferent based on the following course of events. In particular, he claims that Plaintiff states that he was told he

was going to see a GI specialist on February 25, 2021. That appointment was cancelled,

as was the next one of March 31, 2021. He filed a grievance complaining that he had not

yet been seen by the specialist.

> On or around March 15, 2021, I conducted another third
> level appellate review of a medical grievance submitted by Mr.
> Schroder. A true and correct copy is attached hereto as Exhibit
> A, GR000076-77. Mr. Schroder contended that he had not been
> told why his gastroenterology referral appointment had been
> rescheduled and that he was having pain and discomfort from
> Celiac disease. (Id.) The first and second level responses
> showed that Mr. Schroder had been scheduled to be seen via
> Telehealth. (Id.) In my response from March 15, 2021, I
> apologized that medical was not able to connect to Mr.
> Schroder's Telehealth appointment and informed Mr. Schroder
> the issue had been resolved (Id.) I informed Mr. Schroder that
> I had reviewed the medical records which showed he was
> improving while on Prednisone, and that the Prednisone would
> provide relief until the gastroenterology consultation was
> completed with their recommendations (Id.)

Dkt. 32-3, pp. 3-4.

Siegert's assessment was that the telehealth connections had not been working on

the previous dates of Plaintiff's appointments. Siegert did not cause the previous visits to

be missed. There is no causal connection between Siegert and the missed visits.

Plaintiff was seen by the gastrointestinal specialist via a telehealth visit on April

28, 2021. He reported to the doctor that he was told that if he remained on dapsone, he

would not have to be on a gluten-free diet. That seems to be the fallacy that Plaintiff's

entire case is built around. The doctor recommended that Plaintiff remain on a strict

gluten-free diet, which "is the only treatment for celiac." Dkt. 32-5, p. 68. The doctor

recommended a follow-up visit with a dermatologist, which Plaintiff received. The

dermatologist's recommendations, set forth above, do not show that Defendants took a

deliberately indifferent course of treatment for Plaintiff. There is nothing in the record

that shows Siegert violated the Eighth Amendment in the manner in which she responded

to Plaintiff's requests for an evaluation of the delay in receiving his specialist visits. And,

as stated above, the delay is not linked to any delay in treatment—Plaintiff was already

receiving a gluten-free diet and alternative medications for his skin issues.

### 9.  Conclusion

Plaintiff has suffered some serious and extremely irritating health issues, but the

record reflects that Defendants steadily worked to diagnose and treat his conditions. The

record reflects that Defendants were especially protective of Plaintiff's life. That goal, in

their medical judgment, was more important than giving Plaintiff the rash medication of

his choice that had to be delicately balanced with two other substances to avoid another

trip to the ER for life-threatening low-oxygen issues. For all of the foregoing reasons, all

of Plaintiff's claims will be dismissed with prejudice, and this case will be closed.

**MEMORANDUM DECISION AND ORDER - 24**

## ORDER

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Dkt. 32) is GRANTED. This entire case is dismissed with prejudice.

DATED: August 27, 2022

B. Lynn Winmill
U.S. District Court Judge